## Garrison v. Commonwealth.

(Decided December 19, 1930.)

S. MONROE NICKELL, J. BLAINE NICKELL, LEBERN ALLEN and J. C. LINDON for appellant.

J. W. CAMMACK, Attorney General, and DOUGLAS C. VEST for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Earl Garrison appeals from a judgment convicting him of manslaughter, and fixing his punishment at 15 years' imprisonment.

The facts are these: On the day of the alleged crime appellant called at the home of James Pelfrey to see his daughter, Ila, to whom he had been paying rather devoted attention. In addition to a number of James Pelfrey's immediate family, Joe Pelfrey, a cousin was present. While there appellant and Joe Pelfrey oiled their pistols. Late in the afternoon all the Pelfrey family decided to go to Campton to attend a Holy Roller meeting. The younger members of the family walked, and the older members went in a car. After accompanying for some distance those who walked, appellant left, saying that he was going home and would join them later in the evening. Shortly after he left and had turned down a side road leading in the direction of his home, a shot was heard coming from the direction in which he had gone. While en route home appellant changed his mind and decided to return to Campton. A passing motorist picked him up, and as they drove to Campton they passed the group with whom appellant had started. According to Ila Pelfrey, appellant asked her sister Emma to let Orville Roberts escort her home, and said

that he would see to it that her parents did not object as he was running the town that night. After the services appellant and Orville Roberts started toward the Pelfrey home, accompanied by Ila and Emma, and preceded by the other members of the party with whom they had gone to Campton. As they passed Orville Roberts' home, appellant suggested that Orville take the girls home in his Ford Car. Orville agreed to the arrangement on condition that appellant would crank the car, which appellant consented to do. After Orville turned the car around, the girls refused to get in the car unless Orville agreed to invite those ahead to ride. After Orville acquiesced, appellant got in the back seat and the two girls stood on the running board on the left side. While in that position they overtook those ahead. Orville stopped the car and asked them to ride. Joe Pelfrey said, "No, we're walking tonight." Orville repeated the invitation, and Joe Pelfrey again said, "No." Emma Pelfrey stepped off the side of the car, and just as Ila started to step off Orville started the car with a jerk, and the motion staggered her. At the same time a shot was fired which struck and fatally wounded Alfred Pelfrey, one of the group who had refused to ride. Ila says that she did not see who fired it, but saw the flash and it looked to be about the back of the front seat of the car. Immediately after the shot was fired, the father of the deceased came upon the scene and demanded to know who had shot his son. Orville said that he had not shot him, but appellant made no response. Appellant then left and did not surrender until after he was indicted, which was about four weeks later. In addition to detailing what occurred preceding the firing of the pistol, which is substantially the same as that given by the other witnesses, appellant testified as follows: He had placed his pistol under his pants belt that evening, and as he walked along it would slip out. To avoid this he carried the pistol in his right hand, gripping it near the middle. When he cranked the car he switched the pistol to his left hand, and then back to his right hand after the car had been cranked. When he saw that the girls were not going to ride, he started to rise for the purpose of getting out of the car with them. As he did this the car started and threw him off his balance. As he was about to fall he gripped his pistol in some way and it went off. The door on the side of the

car next.to the Pelfreys was. open. Orville stopped the car and said, "What is the matter?" Appellant said, "This damn gun went off." About that time Alfred Pelfrey said some one had shot him. He and Orville got out of the car and started to where he was. At that time James Pelfrey, his brother, and his wife, and other members of the family, came up. They were much excited and he was afraid to stay, and left immediately. He went to the home of the sheriff to give himself up, but no one answered. He then started out of town and met Clayton Roberts, who told him that the Pelfreys were threatening him and very mad. He did not come in or give up, but stayed out there sleeping in a cliff and a house part of the time for three or four weeks. He did not know whether he could give bond or not, and did not care to go to jail. Soon after he was indicted he returned and surrendered. In addition to the foregoing facts, all the witnesses, both those for the commonwealth and for the defendant, say that appellant and the deceased, Alfred Pelfrey, had always been good friends, and that there was no ill feeling between them or any of the persons present. They also say that the shooting occurred just as the car started up.

In addition to an instruction defining certain words, the court instructed on murder, voluntary manslaughter, accidental killing, and reasonable doubt.

It is first insisted that the instruction on accidental killing is erroneous. The instruction reads as follows:

> "If you believe from the evidence the killing of the deceased by the defendant was not murder, but was unintentional and accidental, you will find the defendant not guilty."

The instruction is attacked because it authorized an acquittal on the ground of accident only in the event that the jury believed from the evidence that the killing was not murder. It did not authorize an acquittal if they believed from the evidence that it was not voluntary manslaughter. The point is well taken. As the instruction was framed, the jury might well have believed that they could not acquit of voluntary manslaughter although they believed the killing was unintentional and accidental. Indeed, counsel for the commonwealth do not contend to the contrary, but concede the error.

The further point is made that the court erred in not instructing on involuntary manslaughter. There was

evidence that the killing was accidental, and that appellant had his pistol in his hand at the time the shot was fired. Thus the situation was such that the jury might well have believed that appellant had reasonable grounds to believe, and did believe, there was no danger in handling the pistol as he did, and that it was done without any purpose of harm on his part, but that the killing resulted from his careless use of the pistol. That being true, there can be no doubt that appellant was entitled to an instruction on involuntary manslaughter. Speaks v. Commonwealth, 149 Ky. 393, 149 S. W. 850; Smiley v. Commonwealth, 235 Ky. 735, 32 S. W. (2d) 51; Peal v. Commonwealth, 235 Ky. 356, 31 S. W. (2d) 602.

Another contention is that, in lieu of the ordinary instruction on voluntary manslaughter, an instruction on the reckless or grossly careless use of a deadly weapon should have been given. We concur in this view. There was no affray, sudden or otherwise. The deceased did not say or do a thing to appellant. There was no provocation reasonably calculated to excite appellant's passion beyond the power of control. That being true, there was no basis for an instruction on voluntary manslaughter based on the theory that the killing was done in sudden affray or sudden heat and passion. Smiley v. Commonwealth, supra; Peal v. Commonwealth, supra. In the circumstances he was guilty only of voluntary manslaughter if the killing resulted from the reckless or grossly careless handling of the pistol. We are not holding that the action of the court was prejudicial, but are deciding the question in view of another trial.

Appellant also insists that the court erred in permitting the witnesses to testify that soon after appellant started toward his home a shot was heard coming from that direction. If, as a matter of fact, a shot was fired by appellant, he was guilty of the offense of shooting on the public highway. This occurred three or four hours before the homicide. Inasmuch as the evidence related to a distinct offense, too far removed in time and place to constitute a part of the res gestæ, and did not tend to show motive, identity, or knowledge, it necessarily follows that the evidence should have been excluded. Howard v. Commonwealth, 230 Ky. 738, 20 S. W. (2d) 748.

We also conclude that the court erred in permitting the witnesses to testify that some time prior to the homi-

cide appellant said, "God damn the old folks," he was running the town that night. This remark was elicited by the suggestion that Emma should not go with Orville Roberts, as her father and mother did not want her to go with him. It was uttered in a spirit of mere bravado, was directed solely at the old folks against whom no offense was committed, and did not refer to, or show appellant's attitude of mind toward, the deceased. The only effect of the evidence was to prejudice appellant in the minds of the jury.

The facts disclosed by the record point strongly to a case of accidental killing or involuntary manslaughter, and while we are of the opinion that the evidence is sufficient to authorize an instruction on murder, and the reckless or grossly careless handling of a pistol, we do not mean to be understood as holding the evidence sufficient to sustain a conviction of either of these offenses.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.